**McLEAN GARDENS RESIDENTS, ASSOCIATION, INC., et al., Plaintiffs,**

**v.**

**The NATIONAL CAPITAL PLANNING COMMISSION et al., Defendants.**

**Civ. A. No. 2042–72.**

United States District Court, District of Columbia.

June 3, 1974.

Gladys Kessler, Washington, D.C., for plaintiff, McLean Gardens Residents Association.

Thomas C. Matthews, Jr., Stephen M. Truitt, Washington, D.C., for plaintiff-intervenor, Citizens for City Living, Inc.

Earl J. Silbert, U.S. Atty., Arnold T. Aikens, Nathan Dodell, Asst. U.S. Attys., for defendant National Capital Planning Commission.

C. Francis Murphy, Corp. Counsel, D. C., Louis P. Robbins, John A. Earnest, Washington, D.C., for defendant District of Columbia Zoning Commission, and others.

Frank H. Strickler, John J. Wilson, Harry L. Ryan, Jr., Washington, D.C., for defendant-intervenor, CBI-Fairmac Corp.

## MEMORANDUM OPINION

PARKER, District Judge.

This case poses questions involving the relationship between the National Environmental Policy Act of 1969 ("NEPA") [1] and the process of urban planning and zoning in the District of Columbia. Implicated in these questions are provisions of the recently enacted and approved District of Columbia Self-Government and Governmental Reorganization Act [2] which define the respective planning and zoning roles of the National Capital Planning Commission and the District of Columbia Zoning Commission. Plaintiffs are the McLean Gardens Residents Association, representing the interests of person living in the McLean Gardens housing units,[3] and Citizens for City Living, acting on behalf of persons residing in the Cleveland Park neighborhood adjacent to McLean Gardens. Plaintiffs seek to establish that defendants National Capital Planning Commission and District of Columbia Zoning Commission are required to

---

1. 42 U.S.C. § 4321 et seq.

2. 87 Stat. 774, Pub.L. 93–198 (December 24, 1973).

3. The McLean Gardens complex consists of garden and dormitory style apartments for approximately 3,000 people covering over 43 acres in Northwest Washington.

prepare an environmental impact statement pursuant to § 102 of NEPA[4] in connection with the processing of an application for the redevelopment of McLean Gardens under provisions of the District of Columbia Zoning Regulations.

The issues presented by this litigation have been extensively briefed. Presently before the Court for determination are cross-motions for summary judgment. The Court has fully considered the memoranda of points and authorities submitted by the parties, supporting affidavits and other exhibits and holds no NEPA duties under § 102 are imposed on the defendants within the boundaries of this litigation.

**I**

The McLean Gardens Residents Association initiated this action in October, 1972, with the filing of a complaint and a motion for a preliminary injunction to restrain the Zoning Commission and National Capital Planning Commission from taking further action on a pending application for the redevelopment of McLean Gardens until the National Capital Planning Commission prepared and submitted to the Zoning Commission an environmental impact statement. This initial application for the redevelopment of McLean Gardens was filed under Article 75 of the District of Columbia Zoning Regulations, and specifically, under section 7501, which deals with "Planned

4. 42 U.S.C. § 4332. This section provides:
   Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

   (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

   (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations;

   (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

   (i) the environmental impact of the proposed action,

   (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

   (iii) alternatives to the proposed action,

   (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

   (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

   Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

   (D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

   (E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

   (F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

   (G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

   (H) assist the Council on Environmental Quality established by title II of this Act.

Unit Developments for Residential Complexes, Shopping Centers, Industrial Parks, and Urban Renewal Projects." The purpose of planned unit developments, according to the Regulations, is

> "to encourage . . . . the development of well-planned residential, institutional and commercial developments, industrial parks, urban renewal projects or a combination thereof, which will offer a variety of building types with more attractive and efficient overall planning and design without sacrificing creative and imaginative planning." [5]

The redevelopment plan submitted to the Zoning Commission under Article 75 called for the razing of the existing structures and the construction of an office building, hotel, shopping mall, hospital, and condominium and rental apartments, on the McLean Gardens site. At that time the Court found that the National Capital Planning Commission, a federal agency, was required by the Zoning Regulations to review and approve Article 75 applications [6] and that this function constituted, in the case of the McLean Gardens application, major federal action significantly affecting the quality of the human environment, [7] and the requested preliminary injunction was granted. [8]

The following month the Planning Commission attempted to determine whether its prior recommendation to the Zoning Commission on the McLean Gardens application had been consistent with the Comprehensive Plan for the National Capital. The Planning Commission is charged with the statutory duty of preparing and adopting a "comprehensive, consistent, and coordinated plan for the National Capital," [9] including recommendations for Federal and District projects, and the Planning Commission in this instance sought to clarify an ambiguity in the record as to . the consistency of the Article 75 proposal with the Comprehensive Plan. [10] It is noted that the Planning Commission, under its published Policies and Procedures, [11] cannot modify its Comprehensive Plan without preparing an environmental impact statement, if the modification is determined to be a major federal action significantly affecting the environment.

Before the Planning Commission could make the proposed determination, however, the ownership of McLean Gardens changed hands and the new owner, the CBI Fairmac Corporation, requested and was granted permission to withdraw its pending Article 75 application from consideration by the Zoning Commission. In its request to the Zoning Commission, CBI stated:

> "5. The new owner does not wish to proceed with the plans now pending

---

5. District of Columbia Zoning Regulations, Article 75, Section 7501.1 (as amended, July 1, 1969).

6. *See* District of Columbia Zoning Regulations, Article 75, Section 7501.32.

7. *See* 42 U.S.C. § 4332(2)(C).

8. Order Granting Plaintiff's Motion for Preliminary Injunction, filed October 21, 1972.

9. 40 U.S.C. § 71c(a) ; D.C.Code § 1–1004(a).

10. The Report of the Zoning Committee of the National Capital Planning Commission of June 4, 1970, recommended approval of the McLean Gardens planned unit development application. The Committee noted that the existing density of 58 dwelling units per net acre constitutes the upper level of the 30–60 dwelling units per net acre range, the density for this area designated in the "General Land Use Objectives 1970/1985" element of the "Comprehensive Plan for the National Capital." The Report implied that the planned unit development application proposed to increase the land use intensity of the site, but did not incorporate clear findings as to the consistency of the proposal with the Comprehensive Plan. The Report is appended as an exhibit to the Motion of the National Capital Planning Commission to Modify Order of October 21, 1972, filed November 21, 1972.

11. Resolution of the National Capital Planning Commission Adopting Policies and Procedures for Implementing the Goals and Policies of the National Environmental Policy Act of 1969, Executive Orders 11507 and 11514 for the Protection and Enhancement of Environmental Quality in the National Capital Region, Paragraph 2(a), 36 Fed.Reg. 23706, 23707 (1971), as amended, 37 Fed. Reg. 3010 (1972).

. . . and will shortly undertake studies for the future orderly redevelopment of McLean Gardens.

6. The new ownership intends to file with the Zoning Commission in the future such zoning application or applications as in their judgment will provide for the orderly and appropriate redevelopment of McLean Gardens." [12]

CBI further stated that it had determined not to file a new application under Article 75 of the Zoning Regulations,[13] and it was orally represented to the Court that the present thinking of the company was to submit a redevelopment application under Article 91 of the Zoning Regulations.[14] Article 91 prescribes the general procedures for amendments of the zoning maps and zoning regulations by the Zoning Commission.

Immediately prior to the withdrawal of the application from the Zoning Commission, Citizens for City Living filed an amended complaint which included, in addition to the original Article 75 claim, a second count urging that the Zoning Commission is subject to the requirements of NEPA in considering an Article 91 zoning application for McLean Gardens. Upon the withdrawal of the Article 75 application from the Zoning Commission, the defendants moved to dismiss the case for want of a justiciable controversy, arguing that the original Article 75 claim was moot because the Article 75 application was no longer pending, and that the Article 91 claim was not ripe because no new Article 91 application had been filed. The motions to dismiss were denied for the reason that CBI had admitted that it would file a future application for the redevelopment of McLean Gardens and that the temporary absence of a pending application did not deprive the case of the status of a live controversy. The Court agreed, however, that it would be better to decide the questions presented in a more specific factual context and thus stayed the proceedings until CBI filed a new application with the Zoning Commission.[15]

In August, 1973, plaintiffs were again before the Court on a motion for a preliminary injunction, this time to restrain CBI from razing three of the buildings on the McLean Gardens site. Plaintiffs argued that destruction of the buildings would constitute an "irreversible and irretrievable commitment of resources" [16] and should be enjoined so that the Planning Commission and Zoning Commission could give consideration to alternatives to this action, as required by NEPA, [17] at such time as CBI filed its new application. A preliminary injunction was issued in order to maintain the status quo pending final resolution of the NEPA issues.[18] The Court determined that despite the absence of a pending application for redevelopment, an expeditious decision on those issues which were justiciable would be in the best interests of all of the parties. Accordingly, cross-motions for summary judgment have been filed and the NEPA issues are before the Court for consideration on the merits.

In their motion for summary judgment, plaintiffs make these arguments:

(1) The Planning Commission, under the District of Columbia Zoning Regulations, must review and approve an Article 75 application for the redevelopment of McLean Gardens. Because the Planning Commission is a federal agency and

---

12. Exhibit to Motion of Defendant District of Columbia Zoning Commission to Modify Order of October 21, 1972, filed December 27, 1972.

13. *Id.*

14. Proceedings of March 22, 1973.

15. Memorandum Opinion and Order, filed May 14, 1973.

16. *See* 42 U.S.C. § 4332(2)(C)(v).

17. *Id.* at § 4332(2)(C)(iii).

18. Findings of Fact, Conclusions of Law and Order Granting Preliminary Injunction, filed October 11, 1973.

redevelopment of McLean Gardens would significantly affect the quality of the human environment, Planning Commission consideration of such Article 75 application requires the preparation of an environmental impact statement;

(2) The Zoning Commission, upon consideration of an application for redevelopment of McLean Gardens under Article 91 of the Zoning Regulations, is acting as a federal agency within the meaning of NEPA and is required to prepare an environmental impact statement; and

(3) Because any more dense land use of McLean Gardens would be inconsistent with the Comprehensive Plan, approval of such land use would constitute a de facto modification of the Comprehensive Plan which would require the preparation of an environmental impact statement.

The defendants have renewed their contention that no justiciable controversy presently exists, and have argued in addition that the Planning Commission is not required to prepare an environmental impact statement upon consideration of an Article 75 application because its function is advisory only, and that the Zoning Commission is not required to prepare an environmental impact statement upon consideration of an Article 91 application because it is not a federal agency. The Court will deal first with the question of justiciability and then with the merits of the justiciable NEPA issues.

## II

■ The doctrine of justiciability is a blend of the mandate of Article III of the Constitution which requires the elements of a "case or controversy" as a prerequisite to the jurisdiction of a federal court, and of policy considerations emanating from cases at equity which have caused courts in the exercise of sound discretion to dismiss actions without a determination on the merits.[19] The Supreme Court has discoursed:

[I]t is quite clear that "the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." . . . Thus, the implicit policies embodied in Article III . . . impose the rule against advisory opinions on federal courts. When the federal judicial power is invoked to pass upon the validity of actions by the Legislative and Executive Branches of the Government, the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines the federal courts to the role assigned them by Article III. . . . However, the rule against advisory opinions also recognizes that such suits often "are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests." . . . Consequently, the Article III prohibition against advisory opinions reflects the complementary constitutional considerations expressed by the justiciability doctrine: Federal judicial power is limited to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.[20] [Citation omitted].

As the following discussion of the ripeness doctrine by the Court demonstrates, the equitable policy considerations behind the concept of justiciability

19. *See* Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207, 1217 (1970) (concurring opinion of Leventhal, J.).

20. Flast v. Cohen, note 19, *supra*, 392 U.S. at 96–97, 88 S.Ct. at 1950.

are not always clearly distinguishable from the constitutional principles:

> The injunctive and declaratory judgment remedies are discretionary, and the courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.[21] [Footnote omitted].

■■ In the context of the present case the defendants have urged that the absence of a presently pending application for redevelopment of McLean Gardens renders this action merely a request for an advisory opinion based on a hypothetical set of circumstances. To an extent the Court is in agreement.

Considering the question of whether the requirement of an environmental impact statement would be triggered by redevelopment of McLean Gardens at an increased density because such development would violate the Comprehensive Plan, the record at this stage does not contain sufficient factual information to resolve the legal issues. The validity of plaintiffs' argument is contingent upon events which have not occurred and may not occur, i. e.: the submission of a redevelopment proposal which does in fact violate the Comprehensive Plan and the

subsequent approval of it nevertheless by the Planning Commission and Zoning Commission. Obviously, these determinations cannot be made until a specific proposal has been submitted and acted on by these bodies. Plaintiffs' citation of the fact that McLean Gardens is acknowledged to be at the "upper level" of the density designated for the area in the Comprehensive Plan, does not diminish, but highlights the uncertainties which underly their contentions. The Comprehensive Plan designates only the "Predominant Residential Development Density" for the area in which McLean Gardens is located.[22] Thus there would appear to be numerous relevant factors which the Planning Commission, in the exercise of its expertise in these matters, would consider on question of the consistency of a specific redevelopment proposal with the Comprehensive Plan, and at this point, without the benefit of prior Planning Commission action, the Court can only speculate as to what these would be. Moreover, the Planning Commission, after making this determination, could very well disapprove the proposal if found to be inconsistent with the Comprehensive Plan, in which event the Zoning Commission might follow suit, or it might amend the Comprehensive Plan to conform to the Proposal, in which event an environmental impact statement could be prepared. And because pertinent provisions of the District of Columbia Self-Government and Governmental Reorganization Act will not take effect until future dates, the timing of the submission of a new redevelopment proposal may affect the content of the Comprehensive Plan, the requirement of Zoning Commission conformity with it, and therefore, the outcome of this issue. Because of all the contingencies which are involved, this problem is not presently fit for judicial resolution, and the wiser, if not the only, course is to refrain from premature adjudication until the governmental bodies

---

21. Abbott Laboratories v. Gardner, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed. 2d 681 (1967).

22. *See* Comprehensive Plan for the National Capital, General Land Use Objectives: 1970–1985 (January 31, 1974).

involved have had an opportunity to consider a definite redevelopment plan in the light of the law and facts which are applicable at that time.

The issues of the NEPA duties of the Planning Commission and Zoning Commission under Article 75 and 91 of the Zoning Regulations, however, stand on a different footing. First, these are legal questions which involve the construction of statutes and regulations and are basically independent of the factual circumstances of a specific redevelopment proposal.[23] There is no benefit to be gained from first permitting the agencies to consider these NEPA issues in the context of a specific redevelopment application since their positions are already quite firm and would not be affected by the details of differing proposals. Application of agency expertise would have no part in the resolution of these matters.

Second, although it is quite true that the original Article 75 application has been withdrawn from the Zoning Commission and no replacement has yet been filed, this case can hardly be said to present moot or hypothetical questions. Defendant CBI has plainly stated that it will seek to redevelop McLean Gardens and will submit a future proposal to the Zoning Commission.[24] Thus, there is not merely a probability of recurrence of the original controversy, but a near certainty, and because of this the plaintiffs have vigorously pursued their claims throughout the duration of this litigation, and the defendants have just as persistently opposed them. There are no hypothetical issues raised by the form which the McLean Gardens redevelop-

ment will take because redevelopment must occur under either Article 75 or Article 91 of the Zoning Regulations,[25] and plaintiffs assert that an environmental impact statement must be prepared for both possibilities.

Finally, in assessing the effect upon the public interest and the interests of the parties of postponing decision until the filing of a new application with the Zoning Commission, the Court perceives that the balance of the equities swings heavily towards settlement of the NEPA questions at this date. By disposing of these issues now, the type of prolonged interference with the administrative process which occurred during the consideration of the original Article 75 application hopefully could be avoided; the parties would be spared the burden of engaging in duplicative litigation; defendant CBI would have more definite knowledge as to the legal implications of an application for redevelopment of its property; and the public policies declared by the National Environmental Policy Act would be more expeditiously served. The Court holds, therefore, that plaintiffs' Article 75 and Article 91 NEPA contentions present justiciable issues which warrant decision on the merits.

### III

The original and amended complaints seek to establish that the National Capital Planning Commission and the District of Columbia Zoning Commission, in processing applications for redevelopment of McLean Gardens under Articles 75 and 91 of the District of Columbia Zoning Regulations, are required to prepare environmental impact state-

23. It is noted that the Court has already found that the originally proposed redevelopment of McLean Gardens would have a significant impact on the quality of the human environment, and that a subsequent redevelopment application is unlikely to have substantially different environmental effects. *See* Findings of Fact and Conclusions of Law filed October 21, 1972.

24. *See also* Plaintiffs' Supplemental Memorandum and Affidavit of James W. McCabe, filed May 22, 1974.

25. Although CBI has represented that it does not intend to seek redevelopment of McLean Gardens under Article 75 of the Zoning Regulations, and will probably submit an application under Article 91, these representations are not binding on CBI and would not preclude it from filing a new application under either Article. *See* note 12, *supra*, and accompanying text.

ments in accordance with § 102 of NEPA. The contentions of the parties have been set forth previously,[26] but in essence they rise or fall on whether the role of the Planning Commission in considering an Article 75 application is sufficiently substantive to constitute "federal action" under NEPA and whether the Zoning Commission functions as a federal agency when it processes an Article 91 redevelopment application (or, for that matter, an Article 75 redevelopment application). To answer these questions it is helpful to obtain a broad perspective of the statutory roles of the Planning Commission and Zoning Commission in the District of Columbia planning and zoning process, and then to ascertain where, if at all, NEPA fits into this scheme.

The National Capital Planning Commission is the central federal planning agency for the Federal and District Governments.[27] By virtue of § 203 and § 423 of the District of Columbia Self-Government and Governmental Reorganization Act ("Act"),[28] the central planning function for the District Government will be transferred on July 1, 1974 to the Commissioner of the District of Columbia and on January 2, 1975, to the Mayor. Thus the Planning Commission, which is presently charged with preparing both the federal and District elements of the Comprehensive Plan for the National Capital, will, effective July 1, 1974, prepare only the federal elements and will retain a veto power over the District elements, which are to be prepared by the Commissioner (and later the Mayor) in conjunction with the District of Columbia Council. Upon assumption of the municipal planning function by the Mayor, the District elements of the Comprehensive Plan which he prepares may include, *inter alia,* land use elements and urban renewal and redevelopment elements. The Planning

Commission is authorized to exercise its veto under § 203 over those proposed District elements which it finds will have a negative impact on the interests of functions of the Federal Establishment in the National Capital.

The District of Columbia Zoning Commission, which consists of three District members and two *ex officio* federal members, will continue under the Act to exercise its present zoning functions, including the adoption of zoning maps and regulations and amendments thereto.[29] These zoning maps, regulations, and amendments, are not presently required to conform to the Comprehensive Plan, but will have to so conform effective January 2, 1975, and will have to be submitted to the Planning Commission for comment and review prior to adoption.

Thus the new Act, consistently with the concern which it reflects for placing greater control over governmental functions of a municipal nature in the District Government,[30] creates a dichotomy between Federal and District planning and zoning roles in the District of Columbia. The provisions cited clearly demonstrate that it is the intent of the Act to leave municipal planning and zoning to the local government and to confine federal interference to those instances where federal interests or functions are negatively affected by local action.

Even under present law, however, the responsibility for zoning decisions lies solely with the Zoning Commission, a District of Columbia agency which performs duties of an essentially local nature.[31] The Zoning Commission has the authority to adopt amendments to the zoning maps and regulations, pursuant to the procedure for amendment set forth in Article 91 of the Zoning Regulations, after submission of such amendments to the Zoning Advisory Council

26. *See* pages 170 and 171, *supra.*

27. 40 U.S.C. § 71a(a); D.C.Code § 1-1002(a).

28. *See* note 2, *supra.*

29. *See* § 492 of the Act.

30. *See* § 102(a) of the Act.

31. *See* D.C.Code § 5-412 et seq.

for opinion or report.[32] The Zoning Advisory Council, also an agency of the District of Columbia, consists of a representative designated by the Zoning Commission, a representative designated by the Commissioner of the District of Columbia, and a representative designated by the Planning Commission. The report of the Zoning Advisory Council, though it must be considered, is not binding on the Zoning Commission. The Zoning Commission also has the authority to approve applications for planned unit developments under Article 75 of the Zoning Regulations, which are in effect, exceptions to existing zoning maps and regulations, after submission of the application to the Zoning Advisory Council, the Planning Commission, and any other appropriate agency, for review and report.[33] The Planning Commission and Zoning Advisory Council, in reviewing the application for approval, must give consideration to, among other things, the consistency of the application with the Comprehensive Plan.[34] After receiving the report of the Planning Commission and any other concerned agency, the Zoning Commission may approve or reject the application.[35]

Plaintiffs maintain that the federal membership of the Zoning Commission (and the status of the Zoning Act of 1938 as a federal law) as well as the review by the Planning Commission of Article 75 applications for approval, inject sufficient federal action into Article 75 and 91 zoning decisions to trigger the applicability of NEPA. They point out that NEPA expresses concern over the environmental consequences of "high density urbanization"[36] and the problems of haphazard urban and suburban growth" and "inconsistent and, often, incoherent rural and urban land-use policies";[37] and that it would be in keeping with these concerns and with the NEPA mandate of compliance "to the fullest extent possible"[38] that § 102 environmental decision-making procedures be implemented where federal input into zoning decisions is present.

Certainly there is a limited federal participation in District of Columbia zoning decision-making due to the *ex officio* federal members of the Zoning Commission and Zoning Advisory Council, and the opportunity for comment by the Planning Commission on Article 75 applications. However, it seems apparent that under the pertinent statutes and regulations control over zoning applications is, and will continue to be, vested in the government of the District of Columbia and not in the Federal Government. That the federal membership of the Zoning Commission constitutes only a minority is consistent with an intent to keep the nature of its decisions predominantly local. The subject matter of zoning decisions is municipal in nature and involves local policy considerations. The purpose of federal participation in the District zoning process is not to superimpose federal policy on District zoning action, but to insure a voice for the federal interests in the National Capital and, when the Self-Government and Governmental Reorganization Act takes effect, to protect the viability of the Comprehensive Plan for the National Capital against inconsistent District zoning action. Thus when the Zoning Commission acts on Article 75 and 91 applications, it acts as a municipal, not a federal, agency;[39] and when the Planning Commission reviews Article 75 applications for approval and reports its

---

32. D.C.Code § 5–417.

33. District of Columbia Zoning Regulations, Article 75, § 7501.31.

34. *Id.* § 7501.32.

35. *Id.* §§ 7501.38–7501.394.

36. 42 U.S.C. § 4331(a).

37. S.Rep.No.296, 91st Cong., 1st Sess. 4 (1969).

38. 42 U.S.C. § 4332.

39. *Cf.* Allen v. Zoning Commission, 146 U.S. App.D.C. 24, 449 F.2d 1100, 1103 (D.C.Cir. 1971); Ruppert v. Washington, 366 F.Supp. 686 (D.D.C., 1973) (notice of appeal filed, No. 73–1986, D.C.Cir., August 6, 1973); Tolman Laundry, Inc. v. Washington, Civil Action No. 9318–73 (D.C.Super.Ct., February 1, 1974).

findings to the Zoning Commission, it acts not as a policy-maker, but as an advisor. The Planning Commission may recommend approval or disapproval of such a zoning application, but only the Zoning Commission has the authority ultimately to adopt or reject the proposal.[40] This type of federal participation in District of Columbia zoning activities does not change their fundamentally local nature. Because NEPA was not intended to reach zoning operations on the local governmental level, it does not apply in this case.[41]

The Court agrees, however, that the environmental policies delineated in NEPA should find expression in the planning and zoning process in the District. The proper avenue for implementation of the purposes of NEPA is in the planning operations of the National Capital Planning Commission, and particularly in the formulation of the Comprehensive Plan, for it is at this stage that federal, rather than local, policy-making comes into play. The Planning Commission has recognized that NEPA responsibilities are involved in its role of preparing, approving and amending the Comprehensive Plan.[42] Furthermore, the thrust of the action forcing provisions of § 102 of NEPA is to inject thorough and comprehensive consideration of environmental policy into federal planning and decision-making.[43] In the area of urban land use, NEPA would be implemented in a fashion far more consonant with these purposes through application at the planning level, where overall environmental policy can be formulated, rather than at the zoning level, where NEPA-type consideration of environmental factors is at best piecemeal,

and at worst, an intolerable and unintended burden on the performance by the Zoning Commission of its statutory duties. The Zoning Commission is not free to ignore environmental policy, for "[w]here . . . the potential environmental effects of the Commission's decision are substantial, it must at least consider the environmental issue to fulfill its public interest mandate."[44] Moreover, the Zoning Commission is required at least to consider the reports of the Planning Commission and Zoning Advisory Council, which may include opinions on environmental factors, in making Article 75 and 91 decisions and soon will be required to conform its decisions to the environmental policies embodied in the Comprehensive Plan.[45] But insofar as the applicability of NEPA is concerned, the authors of NEPA could hardly have intended the Zoning Commission and Planning Commission to prepare individual environmental impact statements each and every time they consider a major local zoning application. The Court believes that a result more consistent with NEPA and with the statutory planning and zoning process in the District of Columbia is achieved through consideration of environmental factors by the National Capital Planning Commission in the course of preparing and amending the Comprehensive Plan and other major planning functions. Accordingly, the Court holds that the District of Columbia Zoning Commission and the National Capital Planning Commission are not required to prepare an environmental impact statement in connection with their consideration of an application for the redevelopment of McLean Gardens under Ar-

---

40. *See,* e. g., District of Columbia Zoning Regulations, Article 75, § 7501.36 ("Reporting agencies shall submit their *recommendations* to the Zoning Commission") (emphasis added). *See also* Citizens Ass'n. of Georgetown, Inc. v. Zoning Comm'n., 155 U.S.App. D.C. 233, 477 F.2d 402, 410 (1973) where the court noted: "The judgment as to environmental impact is a determination of policy committed to the discretion of the [Zoning] Commission alone."

41. Metropolitan Washington Coalition for Clean Air v. Department of Economic Development, 373 F.Supp. 1096 (D.D.C., 1973).

42. *See* note 11, *supra.*

43. *Cf.* S.Rep. 296, note 37, *supra,* at 5.

44. Citizens Ass'n. of Georgetown, Inc. v. Zoning Comm'n., note 40, *supra,* 477 F.2d at 410.

45. *See* note 29, *supra.*

ticle 75 or 91 of the District of Columbia Zoning Regulations.

In accordance with the above, the motion for summary judgment on behalf of the defendants and the defendant-intervenor is granted and the motion of the plaintiffs and the plaintiff-intervenor for summary judgment is denied. The defendants shall submit an appropriate order in seven days.